Mr. Court, my name is Kurt Rylander. I am appearing on behalf of Hamilton Bros. Lumber Company. I am the plaintiff appellant in this case. This case, the court presented a very complex, multi-state, multi-party land and timber swindle, which involved a whole bunch of people and ended up making money, put it by the plaintiff. The issues on this appeal before the court are very narrow. Did the district court correctly grant summary judgment against plaintiff on the claims against Jimmy Ballinger, A, and B, did the lower court properly strike two documents, one, a second declaration of Dale Kinsey, and two, a correction sheet, errata sheet, to a deposition of James Hamilton? Those arguments are pretty well briefed. The one that I'm having difficulty with has to do with Adams, if you don't mind my asking the question. The charge is that there was concealment to your client of the role of Adams. And what I don't understand is, was there, as far as the responsibility Adams had with your client to go out and evaluate the land, was there any evidence that at that time he was being paid by the defendant corporation? I believe so, Your Honor. I believe in the depositions of both Ballinger and Kinsey, they referred to Adams being used on every deal they had with Hamilton. They didn't say every deal. They said that they used him as a finder. But there's no indication he was used as a finder for this. Your client already had, was looking into the deal. Adams didn't find your client. Your client went to Adams and asked him to evaluate. So where is the evidence in the record that Adams was retained by both parties for this particular transaction, not involving the subsequent sale of the raw land, but in this particular evaluation issue? If I may ask the Court in this way, in the deposition of Jimmy Ballinger, he referred to Adams being part of every deal they had with Hamilton. In the deposition of Kinsey, he said that Hamilton on this deal was going to be paid a finder's fee by Balkan, in addition to what Hamilton normally would pay. Who was going to pay a finder's fee? Balkan Enterprises. And that is where in the record in the excerpt. It is in a couple of places, Your Honor. It is the excerpts, the Pellon's excerpts at 143, 144, 145. Would you excuse me? That's the deposition. At what line on page 143? On 143, they talked about how it was paid, what percentage. That was the beginning to line 9. And on excerpt 144, it starts at line 22 and goes to 145, line 5. Well, that doesn't refer specifically to this project. That's what I'm asking you about, is this project. The record is clear. They use Adams to go look for land, and they pay him a finder's fee. But there's a big jump from there that he was receiving money from Balkan for this particular transaction, at the same time that he was being retained by your client to evaluate property. Now, where is that in the record? Well, Your Honor, I'll go again to excerpt 147. They talk about Adams being involved in the deals. I think what Judge Wallace is, I understand his question. Is there specific testimony that Adams was paid by Balkan with respect to this particular deal on which Adams did some work for Hamilton? Well, Your Honor, if I may. Not a general relationship testimony, but specific evidence about this deal. It was my understanding that those deposition pages were with respect to this particular deal. And if the court is interpreting it to be more of a definition of a general relationship, then I'm not sure I can see where the court's interpretation comes from. But if that is the case, then I think it's a situation where the inference should go to the non-movement in this particular case. The inference being that when he's talking about the relationship with respect to these properties, the inference should be that it applies to the Frugland properties. Well, specifically where we have Adams providing the worksheet for the timber crews of the Frugland property, and Ballinger saying he was involved in all these deals. Well, you've got a client that's been working for 30 years. It's not some inexperienced person with tennis shoes. You've got a person who's worked for 30 years. He knows all the players. It's not a situation where he can't find out. Adams is there. He could ask Adams, why is this one of these concealment fraud issues that our cases have talked about? Well, Your Honor, if I can point you again to the excerpt at page 159. And this is the declaration of James Hamilton. This is not a document that's subject to any motions. 159 in paragraph 7, lines 20 through 24. Around the same time, I learned that Balkan had been paying Mr. Adams under the table on percentage evaluations that he came up with on the properties that I bought from Balkan, including the Frugland property. So while I believe the other deposition pages were specific enough for the court's question, I believe certainly this page and that passage should put the court at ease on that issue. That connects him to this property. But where's evidence that there's a fraudulent concealment that causes Hamilton to act in some way? What's the evidence of causation? The damage I thought here was caused because a guy whose name I can't know for sure how to pronounce. Abrazinskis, Your Honor. Abrazinskis, okay. He did a serious, you know, probably criminal fraud. Quick claimed the property to a company that he controlled or was affiliated with, and he flips the land a few times and then sells the timber to somebody else and purports to be acting for Balkan without authority to do so. How does the concealment of a relationship with Adams have any bearing on that causal? Well, Your Honor, I believe it is an appropriate inference to draw. If you have a timber cruiser who's evaluating the land for you, evaluating the value of the timber for one party, and it's unknown that part of their buying from the timber firm is actually paying that cruiser a percentage. How does that bear on the cause of the damage here, which was the fraud by this other man? I can see if your claim was we paid $170,000 for the timber rights, and really they were really only worth $130,000. And the problem was the guy who did the cruise and valued it for us was getting a payoff from the seller. But that's not what caused the problem here. The whole problem is the whole property got sold out from under Balkan. And so I'm not seeing the causal issue with Adams at all. Maybe I'm missing something. Is there a place in your briefing where you give a relationship on that? Certainly there's a place in the briefing where I try to give a relationship. Well, it's sort of a little bit of a, you know, as a good advocate, including everything you think might help your client. But I'm having difficulty with any causal relationship of the Adams disclosure to the damage that was done. Well, certainly, Your Honor, had Adams not been paid a finer fee by Balkan, there would have been more money in the kitty for Hamilton when Hamilton sued Balkan. Well, we have no idea what that is, but it's probably not much, apparently. But when you're trying to recover $170,000 that has seeped down the drain, any pennies on the floor, I think, are going to be easier to grab. Well, that's a good point. Well, you were kindly indicated you were going to spend 10 minutes, but we did question you. Do you have other points that you'd like to make, or would you like us to rely on your briefing? You can rely on the briefing, Your Honor. I would like to have a minute for rebuttal, if I could. Yes, yes. Thank you. You can even have 9 minutes and 24 seconds if you needed it for a while. That's still on your clock. Go ahead, please. May it please the Court, Mark Comstock on behalf of the attellee Jimmy Ballinger, not on behalf of Balkan. And I wanted to certainly address the Court's need for time, and I would rely on my briefing unless there are specific questions that you almost have. I'll say that, as I understand this case, it's primarily we're dealing with state law issues. Definitely. Issues of piercing the corporate bail, issues of fraud. And I think I have a very good handle on those. The case was impacted substantially by the district court or magistrate judge's refusal to permit amendment of the deposition testimony. of the principal of the lumber company who, after more than 30 days had passed, following the deposition or following notice of its availability, hadn't made amendments but then made them a few days late. Yes, Your Honor. I guess I didn't find any Ninth Circuit or other circuit authority specifically on that timing requirement. In other words, it's clear literally in Rule 30. But I didn't find any cases that said how strictly it should be enforced. I noted also that there was a second reason the magistrate judge said that that rule requires giving of reasons for amending a deposition and that there was noncompliance with that. But I just wondered if there's any Ninth Circuit or other circuit authority on the interpretation of Rule 30 that you had found, because I wasn't able to find it. I did not find any specific Ninth Circuit decisions other than the Ratavenco case that I cited, which does not specifically deal with compliance with Rule 30. I mean, any case that deals with the problems that led to the exclusion of the amendment. I found no case in the Ninth Circuit, and I don't recall any other circuit case. So you rely on the literal language of the rule? I do, Your Honor. And specifically, I want to address that because the magistrate judge's decision to strike the deposition corrections comes before you on an abusive discretion standard. And here, the sequence is important because the record is clear that the deposition transcript of Mr. Hamilton, the plaintiff's representative, was available to both plaintiff's counsel and Mr. Hamilton on December 31, 2001. And the record's also clear that there were no corrections. There were no timely corrections made within 30 days of December 31 because the corrections came in early in February. That's correct, Your Honor. And when the corrections came in, there were no reasons given for them as is required. I understand that. That's exact. But I also understand that the availability at the end of December is established by a court reporter affidavit or declaration saying that at least by that date I made it available, but that the witness probably received a transcript sometime in January. He certainly did, Your Honor, because Mr. Rylander's office received the transcript on January 7th. May I ask a question? What – is it implicit in your argument that if the deposition were admitted, that then there would be a sufficient conflict in the evidence that summary judgment would not be appropriate? No, I don't believe – I believe that at that point you need to get into the Ratavenco and the Kennedy analysis that is in the – cited in the brief, and that is you have to determine whether or not there is a conflict and whether or not the corrections were, in fact, a sham. Implicitly, I believe Judge Hubel determined in his – He seemed to be pretty skeptical about the amendments. Yes, Your Honor. From his comments. I wouldn't think it would be an abuse of discretion normally for a trial judge to make those kinds of rulings. But on the other hand, if it were just a question of something a few days late and there were good reasons given for the amendments, then I'm not sure we would be able to sustain the exclusion of it. But when it's coupled with a failure to give reasons for the amendments and the color of the amendments and the comments of the trial judge that looks like they're maybe tailored to defeat the summary judgment motion. And the amendments were made after the summary judgment motion was filed? Yes, Your Honor. They were almost a month after the summary judgment motion and all the supporting documents. And then the affidavit that was excluded was submitted after the close of briefing and called for on the summary judgment? Yes, Your Honor. It was after all the close of briefing, after the close of argument. How do you address this issue that I raised on Adams? If there was a nondisclosure on Adams, at the Adams relation? I realize your client was the employee, not Balkan. But since he was employed by Balkan in a high position, it might affect him. How do you address the nondisclosure of Balkan's relationship with Adams? First, as to my client, Mr. Ballinger, did not have any knowledge that Mr. Kinsey, the other principal of Balkan, was in fact going to pay Mr. Adams. And I believe that is in the record at 148 or 149. So your client's evidence was that he wasn't even aware that Adams was being paid. Also, your client had left the company before this fraudulent quick claim deed. Before the deed, my client had left in late 1994, and the deed was in July of 1995. I really don't have other questions for my part. I have a question I'd like to ask, just due to the dissolution. There was a default against Balkan. Was the judgment actually entered against Balkan? Yes, Your Honor. Okay. So there's a claim against Balkan by the plaintiff here. And then, do I understand correctly, subsequent to that time, there was this sort of dissolution? No, Your Honor. The sequence is this. Mr. Ballinger left the relationship with Balkan at the end of 1994. The administrative dissolution of Balkan Enterprises occurred in September of 1995. September 25, 1995. Correct. Right. And then the judgment is not entered until the end of this action. I don't have a specific date. Well, this is a 54B appeal, so I don't know what else would happen when the actual judgment was entered. It would be after 2002. I have one last question, hopefully last question. I'm sorry. No, I haven't. Now, my question that I have is, is there a valid claim against the monies that Ballinger received from the corporation when the corporation was administratively dissolved, which would allow the plaintiff at least to go after that funding to the extent that it's appropriate? I don't believe so, Your Honor. And here's why. Because any monies that Mr. Ballinger received from Balkan was before December of 1994. And in the supplemental record at 167 to 183, supplemental excerpts of record, you have the 1994 tax returns. And at that point, there was, well, there was income in that year of $105,000. There was inventory existing at the end of the year of $32,500. There was a rental property of approximately $63,000. There was a note receivable of $22,000. And then the property, the property at issue with plaintiff was there. But you claim that that distribution took place before 94? No, Your Honor. Any monies that Mr. Ballinger received was before December of 94. Well, that's the problem I'm having. At excerpt of record 48, it indicates that he received a draw on May 14, 1996. In excerpt 49, it refers to a distribution of the same amount, $15,513. And it has a date at the top, which I don't understand. This is 5-31-95. And then in excerpt 58, it talks about a loan, 3-15-96, for the exact same amount, $15,513. So you have three different indications in the records of the same amount of money going to Ballinger, $15,513, at three different dates, and they're designated differently, distribution, draw, and loan. Now, if you can explain that to me, I would be grateful, because it will help me in trying to decide this dissolution issue. I believe, Your Honor, that those are accounting entries for the windup of the entity by the accountant. And those were not, in fact, funds that were distributed to Mr. Ballinger. Those were credit entries on the books of the corporation. It isn't one entry. It's three entries for the same amount, designated differently. I appreciate that, Your Honor. I believe those are, I would call them contra accounts on charges against. I don't understand at all what you're saying. What do you mean by credit entry? This was exactly the question I was going to ask you. Previous to 1994, Mr. Ballinger had received a loan from the corporation. I don't have the exact number. You're saying this isn't money he got, it's money he paid back? Let me try to clarify. He did receive money before 1994 in the form of a loan. After, in the windup, it was characterized as a distribution at that point, because Mr. Ballinger did not have to pay the loan back. And that's why there are the direct $15,000 entries of the same number. So a loan was given at an earlier time. An accounting decision was made after he left that the loan, which had not been repaid, should be reclassified as a distribution. Correct, Your Honor. And, therefore, they make the entries that treats the write-off of the loan as if it was a distribution to him. Yes. Is that the gist of it? That is the gist of it. Okay. And there's one other salient point. And that is in July of 1995, Mr. Ballinger did write and deliver a check to Mr. Kinsey for $18,600. I thought it was $18,469. $18,469. That was cash that went to windup for the accounting fees and winding up the court. He delivered it to cover half of the company's windup expenses. Does that be like out-of-pocket expenses for the windup? Yes. Like for accounts and so on? Correct, Your Honor. Okay. It's not half of what would be needed to pay all creditors. No, Your Honor. I got it. Okay. Okay. Do you have anything else? Any other questions? Judge Wallace? No. Judge Grizan? No. Thank you. We can rely on your briefing, I think. Thank you. Now, I think we would like further to make your rebuttal, if you want to make it. Your Honor, I have nothing further to add. It would rely on the briefing. The question is for me. No questions. We really appreciate the argument. It's a very challenging case. Very well presented. Thank you. Thank you, Your Honor. Okay. We call the last case for the day, U.S. v. Moreno and Nick Hernandez. This Moreno-Hernandez case is set for 10 minutes each side, and we will have to keep you to that clock. So, we can start with you first.
judges: Wallace, Gould, Berzon